case for argument is 20-1713, Centripetal Networks versus Cisco Systems. Mr. Hanna, welcome back. Thank you, Your Honor. This forum is very interesting and new to me, so thank you for having me back on the line. So, Your Honor, may it please the Court. So, with respect to the 20-1713, this appeal involves two different patents, the 205 patent and the 077 patent. But again, it has the same issues with regard to the dynamic security policy that we talked about with regard to the 1634, in that the Board reads out the word dynamic from the rather than waste any time and go over those arguments again that we just discussed. I would say that the junk reference here does not even have a dynamic security policy in any sense, in that it doesn't even have rules that are going to be able to be sent to these different devices. Looking at junk, and that's the J-U-N-G-C-K reference, it discloses only pieces of information that an administrator can use. And this is even farther removed from the Board's construction of any rule. Again, dynamics completely read out for the same reasons. The disclosure is similar in the 205 and the 077 patent, that dynamic needs to have some patentable weight. But even then, there's not even any rules that are going to be sent from these different devices. Now, the 205 patent specifically requires that you're going to receive a plurality of dynamic security policies from a security policy management server. That means that security policy management server must have the dynamic security policies on there, and there's just no evidence that junk has any of that. This is Judge Post. The Board devoted quite a few pages to this, and they concluded that junk teaches boundary-specific rules, right? Can you take issue for that, with that? Oh, absolutely, Your Honor. So this argument pertains to both the 205 patent and the 077 patent. And the issue here is that, in fact, the Board only talked about it for, I would say, it was very cursory, and they essentially said that we, that Centripetal, did not contest that. And that's just simply wrong. I mean, if you look at appendix page 152, the Board specifically said that Centripetal did not argue the point regarding the boundary rule limitations of the 077 patent or the 205 patent, and they just simply got that wrong. And so, based on NRAINUACIV, there needs to be some explanation for its action. And here, the Board didn't feel like it needed to give any explanation because it didn't think that we contested that. And we argue the point is, you know, in our briefing at pages 47 through 51, we have numerous citations to it demonstrating why the boundary rule limitations are not met. So at a threshold matter for the boundary rule limitations, there's simply just no explanation that we can respond to. But getting to the actual prior art, Junk does not teach receiving these rules from a policy server. It simply doesn't. In these various embodiments, it has these pieces of information that might be able to come down. There's this vague reference to these other external devices in these various embodiments. I mean, Junk is this very long and complicated reference, but it never teaches that you're actually going to provision devices with these boundary rules. And if you look at the 077 patent, which, you know, we've now turned to, that is a specific requirement of the claim. The claim requires that you have to provision each of the plurality of devices with these one or more rules generated based on a boundary of a network. That disclosure is simply absent from Junk. It never teaches that you're going to be able to take rules from other devices and then provision another device based on those boundary conditions. And so for at least those reasons, Your Honor, this issue simply was not addressed. And so it needs to be remanded, at the very least, in order for the board to consider the arguments and to actually provide a reasoning. Or it should be reversed because they didn't provide... Counsel, these are combination rejections, aren't they? And you haven't talked about Batia. Well, for the boundary rule claims that we turn to for the 077 patent, they don't use Batia for those limitations. Now, so for Batia, Batia they use for saying that it's a dynamic security policy, which applies to the 205 patent. And Batia simply discloses, they point to the fact that it has an address, just a number, an IP address, which was just a reference to be used. But there's no rule there. I mean, that's what it comes down to, that this reference is even farther away. These references are even farther away in that they just have these pieces of information that wouldn't even constitute a rule. So in addition to the fact that dynamic was being read out of the claims, they don't even meet the criteria. For Batia, for instance, it doesn't talk anything about any rules, much less a dynamic security policy, because it only talks about receiving particular IP addresses without more. And that, I mean, under both parties, the board's construction, our construction, it's going to require more information that it can't just be just an IP address by itself without any more information. So Batia definitely, that's what they rely on Batia for, is for the 205 patent to try and teach also a dynamic security policy. And it doesn't even meet any of the criteria for that. They also rely on Batia for teaching this allow list issue in that the claims in the 205 patent specifically require you have a rule, and that rule tells you what packets to forward. And then you have another rule that tells you the packets to drop. And this is this allow list. And if you look in the specification of the 205, it actually talks about and it uses those words. It's an allow list. Batia is a completely different system. Batia is about voice over IP. And so its goal is to not drop packets. And that's why you have this authentication issue. So with a voice over IP system, with these real-time communications, you want to do everything you can not to drop packets. And so what Batia will do is it will have these rules that are set up. And what it's going to try to do is it puts these packets on a rest list. And that rest list is done for authentication and different measures. But you don't want to just drop this traffic. And we have a nice diagram, I think, in our briefing in which it shows the table in terms of what the 205 patent has and what Batia discloses. And what happens is these are just completely different concepts. And so there is nothing in the record that says that they're going to have these drop rules. And the board comes back and says, well, someone would have known that ultimately these would be drops. Well, that's not enough. That's not enough particularly when they have claim limitations that specify that you need to drop these packets. You need to have rules that tell you to tell you to drop. It's not enough to punt it off to another rest list to do some type authentication. So that's where Batia comes into the mix with regard to the 205 patent. An additional argument for the 205 patent is the Engate issue and that the Engate is not a printed publication. Now, this applies to Claims 8, 24, and 40. And it's undisputed that Beer testified that, and just as a reminder, so Beer was set up to testify regarding the public availability of Engate in the underlying proceedings. And he testified at Appendix 577 to 78, this is referenced in our apply at page 9, that you need a login. You need a login in order to access these documents. And so it's on a password-protected website. So one of skill in the art or interested parties would not be able to readily access this document. So what the board said about that, right, is that they agreed you needed to create a login. But if you create one for yourself, you can access the site, right, just as you can access your email or your work computer because you created a login. So what is there about creating a login that makes this inaccessible? I'm not understanding. No, it's the fact that there's no evidence that anybody actually did that. That is password-protected. It's not just widely disseminated and that you actually had to do that. You would think that if they had evidence of people logging in to be able to access Engate, they'd have some evidence. They would be able to testify that, oh, yes, we have records of people logging in. Here are the records. And that is just a lack of proof on their behalf to show that people that were interested actually were able to access and did access the Engate reference. And so when the board acknowledged this, it really turns on papers that are left on a back table in a conference, whether that's sufficient to be public dissemination. Because Beer testified that the paper was not discussed. He said, didn't show anybody. He said the only two people that looked at it were him and a fellow employee at Cisco. And so it turns on if you have a stack of papers on a table in the back of a conference with no indication, no evidence that someone actually picked up that paper and read it. And he didn't discuss it at the conference, whether that's enough to be a printed publication. And based on all the case law, that is just not enough evidence. That's just not enough. You can't have a paper sitting out someplace at a conference and have that. It seems to me, maybe I'm misremembering the record, but the board cited quite a few pieces of evidence based on the declaration from the author. Right. And it was more than just being on a back table. They said the reference was published and available. It would have been posted online in the ordinary court. It was on the website shortly after it was published. I mean, there's a lot more than just it being left at the back of the table that the board relied on. Right. I mean, I'm looking at Appendix 108 through 12. Okay. Respectfully, Your Honor, I think you may be thinking about the maybe the ACNS reference, in the first case in which they said that it was published pursuant to a link. But anyway, what was that citation? And then I just heard the buzzer. Appendix 108 through 112. That's talking about Engate. Yes, correct. This is talking about Engate. But again, it goes to the same thing. So the only evidence that they really point to is that these two people accessed it. The author in this, Mr. Krishna, they said it was on a, during the deposition, he said it was on a, that was password protected. And then they point to the Wayback Machine. That couldn't be verified. Mr. Beer's testimony said, during his deposition, said it couldn't be testified. Okay, well, we all know, we all can read what they said. I didn't want to take your time. I was just pushing back on what seemed to me to sound as if you were saying the only thing was that they were in the back of the table in the back of the room. Well, I think, and just to clarify, that's the only, that's the only thing that is, his deposition was contrary to all these other points, except for the papers being left on the table. That was my point. Okay, I think, Joseph, did we hear the buzzer? Are we into rebuttal time? Yes, we are. Okay, so why don't we hear from Mr. Wagner and restore your, and keep your rebuttal time, Mr. Wagner. Thank you, Your Honors. May it please the Court. I'll go ahead and start by picking up on Chief Judge Prost's question here of, you know, the board did rely on a significant amount of additional evidence other than the Engate reference has just been on a table in the back. And it's, the whole record is replete with evidence that shows that Engate, as a company, was looking to publish and disseminate this Engate article. It's not something that was pass or protected. There's no expectation of confidentiality. Every fact is pointing in the same direction. They wanted to get this out. And looking really at the standard itself for public accessibility, you know, we see from the Acceleration Bay case that a reference is considered publicly available if it was disseminated or otherwise made available to the public to the extent the person's interested, exercising reasonable diligence, can locate it. And that's the facts that we have here on the Engate article. The Engate reference itself on its face is a partner information guide. Mr. Beer testified that partners are customers, potential customers, and that the Engate reference itself was authored to disseminate this information to customers and potential customers. It was posted to the website under routine business practices, which Centripetal doesn't seem to deny. Once you got to the website, you see there's only five, maybe six white papers depending on the time. And it would certainly be easy enough to find from that page. It's not buried somewhere. It's right there on the webpage. Centripetal, in its reply, does assert that even ultimately the board's factual findings are insufficient to establish the person's interest or skill in the art would have been independently aware of even the Engate website that would include at least five or six pieces. And that's simply not true. And the board relied on the evidence that's there of Mr. Beer stating that he'd actually shared that Engate website with people. He's pointed to them to document. There's nothing about this screenshot that shows that it would have needed an account. And to the earlier discussion, if an account is needed, you simply go freely go to the website, you create an account, you log in, and you can access the documentation as Mr. Beer testified in his deposition. But even beyond just the website, the explicit link to the Engate reference was widely disseminated via the knowledge-based article that Mr. Beer talks about as well. And that knowledge-based article, it's that appendix 4762, includes a direct link to the Engate reference. And Mr. Beer testified these are the things that were disseminated on the website, via email, to seminars, to hundreds of customers, and potential customers. And that's confirmed from the knowledge-based article itself that at the top, to be removed from the email distribution, send a note to this person. So that direct link was sent out to all of these customers and potential customers as marketing material. And what Mr. Beer also testified to when discussing whether an account was required or not, was that if you did have this direct link, it's highly likely that you would not have needed an account or any login there. So even if there was a login required for some part of the website, if you had this direct link from the knowledge-based article, you probably wouldn't need that login anyway. So people using reasonable diligence would have known where the link was. They would have known where to get to the website. The evidence clearly establishes those facts and fully supports the public accessibility finding of the board. Similar to the physical distribution that's there, this just lines up exactly with how these conferences work and the facts that came out here. Mr. Beer drafted this Engate reference. He posted it to the website. A few days later, he takes it to a conference to present about the concepts in the paper. He sets the paper out for people to take. Certainly, the people that are there for this network security conference using reasonable diligence could find that paper that, again, meets the standard for public accessibility and the facts fully support that issue. Mr. Wagner, this is Judge Prost. Could you respond to what your friend said about the printed publication question? Certainly. With respect to the boundary-specific rules, Your Honor? Yes. Okay. Certainly. So if we look at the 077 patent, Claim 1, which is, I believe, where Mr. Hanner was focusing, we have these one or more rules that are based on a boundary of a network. It turns out that YUNC and the 205 patent describe these boundary-specific rules almost identically. In the 205 patent, for instance, starting at column 16, line 52, the 205 patent gives these examples of what a boundary policy is. It's a dynamic security policy that implements ingress filtering. It may comprise one or more rules that filter based on the packet source address that basically look to see, are these downstream packets coming from a possible source that we know? We know I only serve these many clients. We know the world of possible IP addresses. We're going to let those in and exclude all the others. That's necessarily going to change based on which boundary you're in. The 205 patent says we want to do this to prevent spoofing. When we turn to the YUNC reference at paragraph 111, for example, we see the exact same type of discussion. We see that YUNC is talking about ingress filtering, so both the 205 patent and YUNC call this ingress filtering for boundary-specific rules. YUNC says we do it because there might be a forgery instead of spoofing, but that's really the only distinction here between the 205 patent and YUNC on what these boundary-specific rules are. YUNC goes through a specific example in that paragraph about that same idea. We know which clients we serve. We know where these packets could possibly be coming from. If it's something different, we're not going to let that through. Where it comes from, where do these rules come from? In embodiment three, we see that there's a discussion that this could come from a subscribing server, a virus watch service, this kind of four-example language that follows exactly this concept of the subscribing server or the virus watch service in embodiment three. When we turn to embodiment... Let me interrupt you before your time runs out. Can you respond to the argument that YUNC and Boddia just disclosed pieces of information and not rules? You know, they certainly don't. I think embodiment four is certainly one that is of interest in looking at figure six. We actually see the concept of rules right in this router. They're using the same word. I know, obviously, using the exact same word in different references doesn't always mean the same thing, but here it does. What they're talking about in YUNC are these are the types of packet filtering rules that we need to determine what to do with these packets. They are being defined remotely by these external devices or by this management device. These type of rules say they analyze the header, and then they determine is this something we're going to forward or is this something we're going to drop. That necessarily requires the indication of the criteria. What is the IP address, for example, or what is it about this packet that we're looking at, and then what do you do with it? That meets the condition that it is a rule. There's a condition that causes something to occur, and it just wouldn't work otherwise. You can't just send an IP address, and this is true for YUNC and Boddia. If you just send an IP address randomly to a device, it's not going to do anything with it. It's not going to know what to do with that IP address or any other simple chunk of information, for that matter. What it needs when these are being remotely programmed is to say, here's the IP address or the criteria, and here's what you need to do with it. When we look at Boddia, in that example, I believe I heard Mr. Hanna say, you know, it's just sending IP addresses, but again, for the same reason, that's not the case. It has to indicate where that IP address is supposed to go. Is that IP address associated with the white list, which means that we're going to forward the packets, or is that IP address associated with the black list, which means we're going to drop the packets? That indication of which list it should go on is indicative of the exact function that needs to be tied with that Mr. Hanna raised as well. And there's been a little bit of a point of contention throughout the IPR proceedings as well as in the briefing. And that goes to the steady state or the rest list issue that has been brought up. And in the steady state concept, what I mean by that and what comes out of the briefing and the testimony is that where the rest list effectively ends up being empty. Boddia has seen all the packets that are coming down from its clients. It has the server here. It knows, again, from Lurdy Yonk which clients are going to be receiving some. At some point, it's seen all of those, and it comes to that steady state. So, every IP address is going to be on the white list or the black list. Centripetal accuses us of egregiously misrepresenting some testimony from Dr. Jaffe, and I just don't understand kind of how they're reading it a different way. So, I think looking at appendix 2873, page 68 of the testimony, starting at line 18, Mr. Price asks Dr. Jaffe, so there's a ton of traffic that could potentially be received from IP addresses that aren't on the white list or the black list, correct? Dr. Jaffe ultimately answers, in a practical sense, no. That fully supports the steady state concept that's cited by the board that Dr. Jaffe discusses as well in his declarations. And Centripetal doesn't seem to take any issue with at the steady state. Boddia certainly teaches this allow list functionality. They take issue with whether it would occur or not. But again, the only evidence, the testimony that they cite saying it wouldn't, I believe they're actually just misreading. But even outside of the steady state in Boddia, it still meets these limitations because while Centripetal takes issue with the packet needing to be further processed when it's first received, the ultimate piece is that it does end up on the white list or the black list. If it comes in and it's already not on there, they say, okay, we're going to authenticate it. It's authenticated. The IP address goes on the white list and the packet's forwarded. If it's not, the packet goes on the black list and the packet's dropped. So, in any case, every packet that's dropped corresponds to an IP address that's not on the white list. So, it also meets those limitations as well. Anything further? I could briefly address the dynamic security policy issue just in the slight differences that we see here with the 205 patent, if that would be helpful to your honors. Otherwise, I'm happy to yield. Well, I think we elided the argument. Okay. Perfect. Then I will yield the remainder of my time. Thank you, your honors. Thank you. Mr. Hanna. Yes, your honor. Thank you very much. So, I will just go in order. In terms of what the board relied upon in terms of the public accessibility of NGATE is that the board relied upon the declaration but ignored the deposition testimony. And that's the point that we're trying to raise here is that you need to consider the deposition testimony, which was contrary to the statements that these vague inferences that were made in the declarations, which we point out with the citation I gave earlier. With regard to the junk reference saying that on the boundary limitations for the 077 and also certain claims of the 205 patent, again, we'll point to appendix page 152. And in page 152, the board specifically said, and I quote, patent owner does not address these aspects of petitioner's arguments. And that is just incorrect. If you look at our opening brief at pages 47 to 51, we provide numerous citations to the record in which we specifically argue that point. And we don't have a record from the board saying and any argument from the board that we can potentially address that's going to say why those limitations are met, specifically with regard to provisioning of the devices with these boundary. And the council didn't point to anything that where the board actually addressed our arguments. And so that's why that argument fails. With regard to the rules aspect, and this is to the 205 patent and the 077 patent, I mean the 205 patent, with the pieces of information that are coming down, what you constantly hear is that it is only these pieces of information. Nothing in the record shows that you actually have a complete dynamic security policy on a security policy and having that being transferred to another device, such as a packet security gateway. And that is specifically what's required in the claims. And so while there's these indications, the council said, there's these rules that could be created and this information could happen, the reference doesn't actually disclose that. And that's the issue for those limitations. Okay. Thank you. Unless there are other questions, I heard the buzzer. Yes. Thank you. We thank both sides and the case is submitted.